IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JOHNNY DAVIS, IV,

                Plaintiff,

    v.

CON-WAY FREIGHT INC.,
CON-WAY INC., CON-WAY
WESTERN EXPRESS,

             Defendants.

No. 3:14-cv-01389-HZ

OPINION & ORDER

Charese A. Rohny
CHARESE ROHNY LAW OFFICES
1515 S.W. Fifth Ave., Suite 1010
Portland, OR 97201

Mark Gillis McDougal
KAFOURY & MCDOUGAL
411 S.W. Second Ave., Suite 200
Portland, OR 97204

       Attorneys for Plaintiff

Margaret S. Fonberg
Paul C. Buchanan
BUCHANAN ANGELI ALTSCHUL SULLIVAN, LLP
321 S.W. Fourth Ave., Suite 600
Portland, OR 97204

1 - OPINION & ORDER

HERNÁNDEZ, District Judge:

Plaintiff Johnny Davis brings this employment discrimination action against his former employer, Defendant Con-Way Freight, Inc.[1] Plaintiff claims that Defendant discriminated against him because of his perceived or actual disability, in violation of ORS 659A.112. In addition, Plaintiff brings a claim of wrongful discharge, alleging that he was terminated for invoking his right to health care benefits.

Defendant moves for summary judgment on both claims. Defendant asserts that Plaintiff was terminated for failing to report damage to a company trailer, a legitimate and non-discriminatory reason. In addition, Defendant argues that Plaintiff's wrongful discharge claim is preempted by ERISA. Finally, Defendant asks for an award of attorney's fees, contending that Plaintiff's claims are "frivolous, unreasonable, or without foundation." See ORS 659A.885(1).

The Court heard oral argument on Defendant's motion on August 31, 2015. For the reasons that follow, the Court grants Defendant's motion for summary judgment. However, the Court denies Defendant's request for attorney's fees.

## BACKGROUND

Plaintiff worked as a truck driver and sales representative for Defendant from July, 1995 through his termination in November of 2012. Second Amended Complaint ("SAC") ¶¶ 5, 21; ECF 29. Plaintiff received positive performance reviews throughout his 17 years as Defendant's employee. Id. at ¶ 12. He also received awards—two state truck-driving championships and a

---

[1] Defendants contend that Con-Way Freight, Inc. is the only proper defendant in this case because the other entities were not Plaintiff's employer during the period at issue. Defendants ask the Court, in the event that summary judgment is not granted to Defendants on the merits of all claims, to grant summary judgment for all defendants except Con-Way Freight, Inc. Plaintiff does not respond to this argument; therefore, the Court assumes that Plaintiff concedes that Con-Way Freight, Inc. is the only proper defendant.

safety award for ten years of having no preventable accidents. Rohny Decl. Ex. CC at 141:25-142:23, ECF 47.

## I.     Plaintiff's alleged disability

In 2004, Plaintiff was diagnosed with chronic myeloid leukemia. SAC at ¶ 6. He gave notice to Defendant by submitting numerous doctor notes. Id. Plaintiff was placed on short-term disability for six months in 2004 while undergoing cancer treatment. Id. at ¶ 7. Since then, Plaintiff's condition has been at times in remission and episodic. Id. at ¶ 8. Even though Plaintiff's cancer is controlled, he continues to have cancer cells in his body and he requires ongoing care and treatment. Davis Decl. ¶ 2, ECF 48. Plaintiff was prescribed Gleevec, which costs approximately $80,000 per year in addition to accompanying medical testing. Id. at ¶ 9.

Plaintiff's chronic myeloid leukemia and the expense of his treatment were common knowledge among his co-workers and managers. Rohny Decl. Ex. Z at 137:3-138:19, ECF 47; Mays Decl. ¶ 9, ECF 45. Specifically, the following managers knew that Plaintiff had leukemia or was a cancer survivor: Clackamas Service Center Manager Jack Baranowski, Freight Operations Manager Aaron Macy, Personnel Supervisor Steve Johnson, and Regional Director of Operations Mark Gantenbein. Rohny Decl. Ex. AA at 70:14-72:4, ECF 47; Rohny Decl. Ex. BB at 40:11-41:9, ECF 47; Rohny Decl. Ex. CC at 12:22-13:5, ECF 47; Rohny Decl. Ex. DD 8:6-8:9, ECF 47. Sometimes, Plaintiff discussed his health issues with Dr. Bud, a "wellness coach" Defendant hired to "deliver Con-way's messages on health and wellness and facilitate Con-way's wellness program." Davis Decl. ¶ 3, ECF 48. In addition, Plaintiff was "known for being vocal, boisterous, and speaking his mind about his cancer and health insurance." Mays Decl. ¶ 9, ECF 45.

On or about September 14, 2012, Plaintiff learned that he had lost his major molecular response to the Gleevec medication, which could mean that leukemia cells mutated, the leukemia could return, or Plaintiff would need a new drug therapy. Id. at ¶ 15. During the fall of 2012, Plaintiff volunteered to do extra shifts on the weekend in order to afford his increasing health insurance premiums and costs. Id. at ¶ 17.

## II.    "Regarded as disabled"

On November 12, 2012, Plaintiff was sent home from work following an emotional interaction with one of Plaintiff's managers, Freight Operations Supervisor Dean Pierce. Rohny Decl. Ex. L, ECF 47. Plaintiff contends Defendant regarded Plaintiff as disabled when Mr. Pierce determined that Plaintiff was "not fit to drive or work because of [Plaintiff's] mental or physical health condition." SAC ¶ 30.

## III.    Defendant's "culture of health and wellness"

Defendant uses a self-insured group health plan for its employees.[2] Hart Dep. at 9:12-9:16, ECF 51-1. In 2011 and 2012, Defendant's health care costs were rising. Id. at 9:15-9:16. After the Affordable Care Act passed, Plaintiff heard multiple discussions from Defendant's Human Resources Department employees and managers about health insurance, frustration with rising health care costs, and attempts to contain Defendant's healthcare costs. Davis Decl. ¶ 7, ECF 48. Frequently, these discussions occurred during daily driver meetings. Id. Plaintiff vocally opposed any reduction in employee benefits or rise in premiums. Id. at ¶ 8. Plaintiff raised concerns about being able to afford medication and treatment for his chronic myeloid leukemia if costs continued to increase and benefits decreased. Id.

---

[2] Defendant pays for its employees' health care directly rather than paying an insurance company. SAC ¶ 11. Con-way, Inc. acts as the health plan sponsor and an administrative committee made up of Con-way management acts as the health plan administrator. Hart Dep. at 10:17-11:17, 12-17-20; ECF 51-1.

Defendant implemented various initiatives designed to promote employee health and lower Defendant's health care costs, including distributing brochures about healthy lifestyles, requiring employees to watch movies about getting healthy, and bringing in Dr. Bud to speak to Defendant's drivers. Id. at ¶¶ 3, 12, 13. Defendant's focus on health, wellness, and the cost of health care caused many employees to openly discuss the fact that Defendant was having difficulty paying high medical bills. Mays Decl. ¶ 15, ECF 45.

On or about October 29, 2012, open enrollment began for 2013 health insurance for Defendant's employees. SAC ¶ 14. During the open enrollment period, Defendant "bombarded" employees with information about Defendant's health insurance plan, its rising healthcare costs, and the need to complete blood or other lab work and submit it along with a health assessment. Davis Decl. ¶ 14, ECF 48. Defendant's employees received a substantial financial incentive to get a health screening, complete a health assessment, and complete open enrollment by November 20, 2012. Id.

## IV.    Defendant's Damage Reporting Policy

Defendant requires its drivers to perform both pre-trip and post-trip inspections of the vehicles they use. Davis Dep. at 34:10-36:12, 63:13-22; ECF 40-6. Drivers are required to report any damage on their Driver Vehicle Inspection Report (DVIR). Id. Defendant implemented these requirements in order to comply with federal Department of Transportation regulations. Huner Dep. at 152:2-11, ECF 40-9.

Under Defendant's Policy 541, failure to report damage or an accident is grounds for termination. Id. at 148:8-159:11. Policy 541 states:

> The following list of work and conduct standards is not meant to be all-inclusive, but is representative of unacceptable performance and behavior which may be subject to discipline up to and including termination.
>                                                         * * *

**Failure to Report an Accident, Damage to Company/Other's Property or Other Incidents to the Company.** For example, failure to report a dropped trailer, vehicular crashes, damage to company property such as vehicles, fences, forklifts, trailers, etc., will result in termination of employment.

Withrow Decl. Att. A, ECF 38-1 (emphasis in original).

The requirements of Policy 541 were understood by Plaintiff. Davis Dep. at 35:10-36:12, 56:8, 63:13-64:15; ECF 40-6. Plaintiff also understood that if a supervisor is present when an employee notes damage to company property, the proper protocol is to report the damage to the supervisor and have the supervisor sign the DVIR. Id. at 36:4-9. If there is nobody at the terminal at the time the damage is noted, the policy calls for the employee to document the damage and write "DT" next to it, which means "dark terminal." Id. at 36:10-12.

## V.   Plaintiff's Failure to Report Damage

On Sunday, November 4, 2012, Plaintiff did a "line haul" (also called a "line run") between Defendant's Clackamas and Medford terminals. Davis Decl. ¶ 18, ECF 48. A line haul is a long-distance trip which, in this case, involved taking loaded truck trailers from the Clackamas facility, dropping them off at the Medford terminal, and then picking up designated trailers in Medford and bringing them back to the Clackamas facility. Baranowski Decl. ¶ 8, ECF 39. Plaintiff forgot the key to the Medford terminal; therefore, he called his manager Mr. Baranowski, who called the Medford manager, Sean Umina. Davis Decl. Ex. RR, ECF 48. Mr. Umina went to the Medford terminal and let Plaintiff inside. Rohny Decl. Ex. EE at 6:15-7:9, ECF 47.

Plaintiff conducted a pre-trip inspection of the two trailers he picked up to take back to the Clackamas terminal. Davis Decl. ¶ 18, ECF 48. Plaintiff noticed existing damage on a corner panel of one of the trailers. Id. Plaintiff described seeing the following damage: "sheet metal was torn off and there was [sic] scrapes and gauges on side." Davis Decl. Ex. RR at 2, ECF 48.

Plaintiff testified that the damage was "significant." Davis Dep. at 226:19, ECF 40-6. However, Plaintiff testified that he did not have an accident or otherwise cause the damage to the corner panel. Id. In addition, Plaintiff declares that "at no point did any Con-way manager or employee tell me that they believed that I had had an accident or otherwise caused the damage to the trailer." Davis Decl. ¶ 23, ECF 48. Defendant offers no evidence or testimony to the contrary.

Despite noticing damage to one of the trailers, Plaintiff failed to make any note of the damage in his DVIR. Id. at ¶ 18. Instead, Plaintiff noted that "everything was okay." Davis Dep. at 51:2, ECF 40-6. Plaintiff testified that he forgot to mention the damage to Mr. Umina or have Mr. Umina sign off to acknowledge the damage, as required. Id. at 53:5-13.

Plaintiff drove the trailers, included the damaged one, back to Portland. Davis Decl. Ex. RR, ECF 48. When he arrived in Portland, Plaintiff performed his post-trip inspection. Davis Dep. at 250:20-25, ECF 40-6. Plaintiff saw the damage again. Id. Plaintiff testified that he thought to himself, "I need to tell them when I get to work tomorrow." Id. at 251:3-4. However, Plaintiff also testified that he chose not to report the damage at that point because "it was irrelevant. . . if you find damage, you're supposed to write it up where you found the damage." Id. at 68:6-14. Plaintiff testified that he knew at that point he would be in trouble for not reporting the damage when he was supposed to. Id. Plaintiff dropped the trailers at the Portland terminal and went home. Davis Decl. Ex. RR, ECF 48.

The next morning, on November 5, 2012, Plaintiff arrived at work at 5:00 a.m. and attended a morning meeting with Freight Operations Supervisor Dean Pierce, his dispatch supervisor. Id. at 75:20, 253:1-25. Plaintiff did not report the damage. Id. at 254:14-19.

Hours later, Freight Operations Supervisor Aaron Macy approached Plaintiff with photos of the trailer damage. Id. at ¶ 19. Plaintiff explained that he had forgotten to make a note of the

damage in his DVIR and that he had not caused the damage. Id. The same day, Clackamas

Service Center Manager Jake Baranowski and Regional Safety Supervisor Jeff Turner asked

Plaintiff to fill out an accident report. Davis Decl. ¶ 20, ECF 48.

**VI.    Defendant's Investigation and Termination of Plaintiff**

From November 5, 2012 to November 12, 2012, Plaintiff continued to work for

Defendant. Id. at ¶ 21. During that time, Mr. Baranowski asked Mr. Umina to look at prior

DVIRs to see whether the damage had been reported by previous drivers of the damaged trailer.

Baranowski Decl. ¶ 12, ECF 39. Mr. Baranowski found no indication that there was any damage

to the trailer before it was assigned to Plaintiff. Id. "Within three days of the issue arising," Mr.

Baranowski reported the matter to Human Resources Generalist Kathryn Withrow, who is based

out of Denver, Colorado, and is responsible for Defendant's Western Area, including Oregon.

Id.; Withrow Decl. ¶ 1, ECF 38.

On November 12, 2012, at approximately 6:00 a.m., Plaintiff had a verbal altercation

with Mr. Pierce about how long it was taking Plaintiff to complete his pre-trip inspection. Rohny

Decl. Ex. L, ECF 47. Plaintiff felt overwhelmed by emotion, as if he were having a panic attack.

Davis Decl. ¶ 25, ECF 48. Plaintiff spoke with a coworker, Jolanda Terrell. Rohny Decl. Ex. K,

ECF 47. He then went to a classroom to take a break and calm down. Id. at ¶ 26. In the

classroom, Plaintiff spoke with a coworker, Marc Kamm, and explained that he was stressed out

about the unreported damage incident, possible discipline, and the fear of not being able to afford

his cancer treatment. Id. Mr. Pierce found Plaintiff in the classroom, told Plaintiff he was "not in

any shape to drive or work," and sent him home without pay. Rohny Decl. Ex. L, ECF 47. When

Plaintiff arrived at home at approximately 8:30 a.m., he called Mr. Pierce and apologized. Davis

Decl. ¶ 28, ECF 48. At approximately 3:30 p.m., Personnel Supervisor Steve Johnson called

Plaintiff and told him that he was "being placed out of service." Id.

The same day, November 12, 2012, Mr. Pierce, Ms. Terrell, and Mr. Kamm[3] documented

their interactions with Plaintiff. Rohny Decl. Exs. K, L, M; ECF 48. According to Mr. Johnson,

he spoke with Ms. Withrow, Human Resources Generalist, about the incident between Plaintiff

and Mr. Pierce. Rohny Decl. Ex. CC at 30:13-35:22, ECF 47. Mr. Johnson testified that Ms.

Withrow directed him to send her the statements of Mr. Pierce, Ms. Terrell, and Mr. Kamm

along with the other documents Mr. Johnson possessed related to the investigation of Plaintiff's

failure to report the damage to the trailer. Id.

The decision to terminate a driver is made by Defendant's Human Resources

Department, not by local service center managers. Withrow Decl. ¶ 5, ECF 38. Ms. Withrow had

the authority to recommend termination and Kevin Huner, Director of Human Resources for

Con-way Freight's Western Area, had the authority to make the termination decision. Id.

On November 15, 2012, Ms. Withrow recommended to Mr. Huner that Plaintiff be

terminated. Id. at ¶ 6. The same day, November 15, 2012, Mr. Huner authorized Plaintiff's

termination. Id. Ms. Withrow declared that she recommended termination pursuant to Policy 541

and that "this was not a difficult investigation" because Plaintiff admitted that he failed to report

the trailer damage. Id. Ms. Withrow declared that Plaintiff's emotional conduct on November 12,

2012 was "inconsequential" to her recommendation and that she does not even remember

considering Plaintiff's emotional conduct in making her decision. Id. at ¶ 7. On November 16,

---

[3] Mr. Kamm declares that he wrote a handwritten statement. Kamm Decl. ¶¶ 9-13, ECF 43. A typewritten
statement that was purportedly written by Mr. Kamm was submitted to Ms. Withrow on his behalf. Id.
Neither party has an explanation for this mysteriously created typewritten statement and Mr. Kamm
declares that portions of it do not reflect what he wrote in his handwritten statement. Id.

2012, Ms. Withrow notified Plaintiff of his termination and told him that all of his medical benefits would cease at midnight of that day. Id. at ¶ 9; Davis Decl. ¶ 29, ECF 48.

## VII.    Employee Termination Review Board Proceedings

On November 19, 2012, Plaintiff sent a letter to Defendant's Employee Termination Review Board (ETRB), requesting an appeal and review of his termination. Davis Decl. Ex. QQ, ECF 48. In his letter, Plaintiff wrote: "I am asking you to overturn my termination due to the fact that I have been accident free and disciplinary free for many, many years . . . I made a mistake in not reporting damage that I saw on a trailer." Id.

On November 21, 2012, the ETRB conducted a hearing. Davis Decl. ¶ 31, ECF 48. Plaintiff read a written statement to the Board, presenting his side of the story. Id. On or about November 27 or 28, 2012, Plaintiff received a letter from the ETRB stating that his termination was reviewed and upheld on November 21, 2012. Davis Decl. Ex. SS, ECF 48.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927–28

(9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

Plaintiff brings a claim of disability of discrimination against Defendant. Plaintiff alleges that his actual or perceived disability was a substantial factor in Defendant's decision to terminate him. SAC ¶ 32. Plaintiff also brings a claim of wrongful discharge, alleging that he was terminated for "exercising an important societal interest and exercising his right to equal terms, conditions, and benefits of employment, including invoking his right to health care benefits." Id. Because Plaintiff fails to establish a prima facie case of disability discrimination and because Plaintiff's wrongful discharge claim is preempted by ERISA, the Court grants Defendant's motion for summary judgment on both claims.

## I.    Disability Discrimination

ORS § 659A.112(a) makes it unlawful for an employer to "discriminate in compensation or in terms, conditions, or privileges of employment on the basis of disability." The Court applies

the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), to claims under Oregon disability law. See Mayo v. PCC Structurals, Inc., 795 F.3d 941, 943 (9th Cir. 2015). "Under that framework, an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination (or retaliation)." Id. (quoting Curley v. City of North Las Vegas, 772 F.3d 629, 632 (9th Cir. 2014). "The burden then shifts to the employer to provide a legitimate, nondiscriminatory (or nonretaliatory) reason for the adverse employment action." Id. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." Id.

In this case, the Court's analysis begins and ends with Plaintiff's prima facie case, as he fails to make one. "To prevail on an ADA[4] claim of unlawful discharge, the plaintiff must establish a prima facie case by showing that: (1) he is a disabled person within the meaning of the statute; (2) he is a qualified individual with a disability; and (3) he suffered an adverse employment action because of his disability." Id. (internal quotation omitted).

A.    Disabled and "regarded as disabled"

Plaintiff alleges that he is disabled within the meaning of the statute because he has chronic myeloid leukemia, which is a physical impairment that substantially limits one or more major life activities. SAC ¶ 28. Plaintiff also alleges that Defendant regarded Plaintiff as disabled when it determined that Plaintiff was not fit to drive or work on November 12, 2012, because of his mental or physical health condition. Id. at ¶ 30.

---

[4] "The Oregon disability discrimination statute is modeled after the ADA. Accordingly, courts interpret [the statute] consistently with the ADA." Hutton v. Elf Atochem N. Am., Inc., 273 F.3d 884, 891 n. 1 (9th Cir. 2001) (citation omitted); see Or. Rev. Stat. § 659A.139(1) ("659A.103 to 659A.144 shall be construed to the extent possible in a manner that is consistent with any similar provisions of the [ADA].").

Defendant does not challenge either of Plaintiff's allegations. Therefore, the Court assumes for the purposes of this motion that Plaintiff establishes that he is disabled or was regarded as disabled.

B.    Adverse action because of disability

Defendant contends that Plaintiff cannot establish a prima facie case because the Human Resources employees who made the termination decision, Mr. Huner and Ms. Withrow, did not know that Plaintiff was disabled or regarded as disabled and, therefore, could not have discriminated against him based on a disability.

In order to establish a prima facie case of disability discrimination, a plaintiff must show that he was terminated because of his disability. See Mayo, 2015 WL 4529357, at *2. It follows that the plaintiff must show that the defendant had knowledge of his disability when making the adverse employment decision. However, the plaintiff's disability need not be the sole reason for the defendant's actions. Rather, liability attaches when the plaintiff's disability is a "motivating factor" in the defendant's adverse employment decision. Arnold v. Pfizer, Inc., 970 F. Supp. 2d 1106, 1135 (D. Or. 2013); see also Head v. Glacier Northwest, Inc., 413 F.3d 1053, 1065 (9th Cir. 2005) ("Therefore, we hold that the ADA outlaws adverse employment decisions motivated, even in part, by animus based on a plaintiff's disability . . . —a motivating factor standard.").

i.    Whether Mr. Huner knew Plaintiff was disabled or regarded as disabled

It is undisputed that Mr. Huner, Director of Human Resources for Con-way Freight's Western Area, was the person with the authority to make a final decision regarding Plaintiff's termination. Withrow Decl. ¶ 5, ECF 38. It is also undisputed that, before Mr. Huner made the decision to fire Plaintiff, Mr. Huner was unaware that Plaintiff had cancer. Huner Dep. at

129:20-131:21, ECF 40-9. Mr. Huner also had no knowledge of Plaintiff's emotional breakdown

after his confrontation with Mr. Pierce on November 12. Id.

        ii.      Whether Ms. Withrow knew Plaintiff was disabled or regarded as disabled

As with Mr. Huner, Human Resources Generalist Ms. Withrow did not know that

Plaintiff was disabled when she made her decision regarding his termination. Ms. Withrow

testified that she did not know anything about Plaintiff's medical condition until after the present

lawsuit was filed. Withrow Decl. ¶ 3, ECF 38; Withrow Dep. at 50:11-19, ECF 40-11.

Plaintiff contends that Ms. Withrow knew that Plaintiff had cancer because, at some point

before November 20, 2012,[5] Ms. Withrow received a medical document that stated that Plaintiff

was prescribed "Gleevec, per oncology/hematology." Rohny Decl. Ex. O at 30, ECF 47.

However, even if Ms. Withrow saw this document before November 15, 2012, Ms. Withrow

testified that she did not know that Gleevec was a medication for cancer treatment. Rohny Decl.

Ex GG, 19:8-10, ECF 47. Plaintiff presents no other evidence to make plausible the existence of

a dispute of material fact as to Ms. Withrow's knowledge of Plaintiff's cancer. The Court finds

that, even viewing the facts in the light most favorable to Plaintiff, there is no basis to draw the

inference that Ms. Withrow may have known that Plaintiff had cancer when she recommended

his termination.

In addition, Plaintiff fails to present any facts from which this Court could draw the

inference that Ms. Withrow knew that Plaintiff was regarded as disabled and that this knowledge

---

[5] The medical document is unrelated to Plaintiff's cancer treatment. Rohny Decl. Ex. O at 30, ECF 47.
The document was created because Plaintiff was assaulted in 2009 and, as part of Plaintiff's vital signs,
the medical professionals noted that Plaintiff was prescribed Gleevec. Id. There is no other information in
the document that relates to Plaintiff's cancer. Id. At one point in Ms. Withrow's deposition, she testified
that she did not know when she received the medical document. Withrow Dep. 19:24, ECF 47. Later in
the deposition, she stated that she received the document approximately three days after Plaintiff was
terminated. Withrow Dep. 93:7, ECF 55-3. The inconsistency in Ms. Withrow's testimony does not
impact this Court's analysis.

14 - OPINION & ORDER

was a motivating factor in her decision to recommend his termination. Mr. Johnson testified that he discussed Plaintiff's emotional breakdown with Ms. Withrow on November 12, 2012 and she indicated that she had read Mr. Pierce's email summarizing the incident. Rohny Decl. Ex. CC at 35:18-20, ECF 46. Ms. Withrow declared that Plaintiff's emotional conduct on November 12, 2012 was inconsequential to her decision and she did not remember even considering it when making her recommendation. Withrow Decl., ECF 48, at ¶ 7.

Plaintiff argued in his briefs and at oral argument that Ms. Withrow possessed documents noting his disability or the fact that he was regarded as disabled by November 15, 2012 at the latest. It is undisputed that Ms. Withrow, as part of her job duties, created a packet of documents on November 15, 2012, for the ETRB to consider in conjunction with Plaintiff's ETRB appeal. Rohny Decl. Ex. GG at 11:8-22:10, ECF 47.

However, a close look at the record indicates that Ms. Withrow recommended terminating Plaintiff at 9:43 a.m. on November 15, 2012 in an email to Mr. Huner. Rohny Decl. Ex. O at 36, ECF 47. Ms. Withrow received the documents for inclusion in the ETRB packet at 10:48 a.m. on November 15, 2012. Rohny Decl. Ex. GG at 15-18; Rohny Decl. Ex. M; ECF 47. Therefore, Ms. Withrow made her recommendation approximately one hour <u>before</u> she received all of the documents compiled for the ETRB review. Accordingly, any knowledge that she allegedly gained by possessing those documents is irrelevant to this Court's consideration of what Ms. Withrow knew when she recommended termination.

Therefore, Plaintiff's case rests on the theory that, because Mr. Johnson told Ms. Withrow about Plaintiff's emotional breakdown and because Ms. Withrow read Mr. Pierce's email summarizing the incident, Ms. Withrow knew that Plaintiff was regarded as disabled and this was a motivating factor in her decision-making. Once again, even viewing the facts in the

light most favorable to Plaintiff, the Court is unable to draw the inference that Plaintiff requests. Mr. Pierce's email does not provide Ms. Withrow with a basis to believe that Plaintiff was regarded as disabled, nor does it mention Plaintiff's cancer. There is no evidence to support the theory that Ms. Withrow was in any way motivated to fire Plaintiff because he had one emotional breakdown, as opposed to the reason for which Plaintiff was already under investigation.

             iii.     Imputing knowledge of lower level supervisors

Plaintiff argues that, even if Mr. Huner and Ms. Withrow were unaware of Plaintiff's disability, the knowledge of the lower-level supervisors is imputed on to them. However, the law does not support Plaintiff's argument.

Plaintiff cites <u>Morrow Crane Co. v Affiliated FM Ins. Col.</u>, 885 F.2d 612 (9th Cir. 1989) for the proposition that a lower level management or first line supervisory employee's knowledge of information is imputed to their employer when the information is material or if it is their duty to maintain the information. In <u>Morrow Crane</u>, the Ninth Circuit applied longstanding agency principles to impute the acts of an agent acting within his apparent authority to the principal. <u>Id.</u> at 614. The case is inapplicable to the present case, where the issue is whether a lower-level manager's knowledge of a plaintiff's disability is imputed onto the employee who makes termination decisions.

In <u>Kimbro v. Atl. Richfield Co.</u>, 889 F.2d 869, 875 (9th Cir. 1989), the Ninth Circuit Court of Appeals determined that the knowledge by an employee's supervisor of his migraine condition could be imputed to management personnel in a failure to provide reasonable accommodations case, despite the fact that there was no evidence that the manager who made the decision to terminate the plaintiff's employment had actual knowledge of the condition. Relying

on Washington law and traditional agency principles, the court stated that "it is clear that

[management] is bound by [the supervisor's] knowledge of Kimbro's medical condition [as it was

clearly established that the supervisor] not only had authority to receive information regarding

Kimbro's medical condition, but also had a responsibility to disclose the nature and severity of

[that] condition to ... management." Id. at 876.

Notably, subsequent cases in the Ninth Circuit and other circuits have distinguished

Kimbro, a reasonable accommodations case, from discrimination cases such as the present one.

For example, the Eleventh Circuit explained:

> First, [Kimbro] was about reasonable accommodations, not discriminatory discharge.
> Second and most important, although ARCO management lacked actual knowledge of
> Kimbro's disability, Kimbro's supervisor was aware of his condition and was responsible,
> under ARCO's own policy, for communicating that information to management. Thus,
> ARCO was essentially arguing that it could avoid liability because its own internal
> policies had broken down. In this sense, Kimbro . . . holds, at most, that when an
> employer designates a supervisor as an employee's contact point for personnel matters
> such as reasonable accommodations, the employer cannot later defend a failure to make
> reasonable accommodations on the ground that the supervisor failed to relate the
> employee's disability to relevant decision-makers within the company. This principle
> plainly has no applicability to a case such as this one where an employee alleges that the
> employer's stated reason for firing her is a pretext for disability discrimination. A
> "pretext" is "a purpose or motive alleged ... in order to cloak [one's] real intention."
> Webster's Third New International Dictionary 1797 (1993). It simply defies logic to
> argue that [Defendant's employee's] "real intention" was to fire [Plaintiff] "because of" a
> disability that [the employee] knew nothing about.

Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1184 (11th Cir. 2005); see also Hedberg v. Ind. Bell

Tel. Co., Inc., 47 F.3d 928, 932-33 (7th Cir. 1995) (concluding that without evidence that the

decision-maker had knowledge of the disability, the determination to terminate an employee

could not have been made "because of that disability," as required by the ADA); Rodriguez v.

Mrs. Baird's Bakery, No., 95-50923, 1997 WL 156989, at *3 (5th Cir. Mar. 25, 1997)

("Rodriguez does not offer summary judgment evidence showing that the supervisor responsible

for his termination knew about his diabetes. Rodriguez claims that he had informed two other

17 - OPINION & ORDER

Mrs. Baird's individuals about his condition and contends that their knowledge should be imputed on the theory of respondeat superior to the supervisor responsible for his termination. While respondeat superior is a theory used in ADA cases to impute actions of an employee-agent to the employer, it is not proper to equate this with the imputing of knowledge between agents of an employer.... When assessing Rodriguez's [ADA] claim, we are concerned with the knowledge of the supervisor who was responsible for his termination.").[6]

The Court agrees with the analysis in Cordoba, Hedberg, and Rodriguez, and finds that Kimbro has no bearing on the present case. Plaintiff was not terminated for illness-related behavior or an illness-related inability to perform his job duties. Had he been fired for one of those reasons, his supervisors' knowledge of his cancer would be relevant because the ADA mandates reasonable accommodation under these circumstances, and, under traditional agency principles, Defendant is assumed to know everything its agents know. However, the conduct Plaintiff was fired for does not require a reasonable accommodation under the ADA. He was fired for failing to report damage to a company vehicle. This adverse employment decision only violated the ADA if it was pretextual, which would necessitate that Ms. Withrow or Mr. Huner had actual, not merely constructive, knowledge of Plaintiff's disability or the fact that he was regarded as disabled.

    iv.    Discriminatory recommendation by a subordinate

Plaintiff argues, alternatively, that a defendant is liable under disability law "if a discriminatory recommendation made to a decision-maker by a subordinate was a proximate

---

[6] The Court acknowledges one case from this District that opined that "there is nothing in Kimbro to indicate that its analysis is not equally applicable to an ADA claim for wrongful termination." James v. James River Paper Co., No. CV 94-142-ST, 1995 WL 938383, at *12 (D. Or. Apr. 6, 1995) aff'd, 101 F.3d 705 (9th Cir. 1996). However, the court in James held that Kimbro would apply where the claim is based on a termination caused by a "failure to accommodate," because the claims go hand in hand. Id. Here, Plaintiff makes no argument regarding a failure to accommodate.

18 - OPINION & ORDER

cause of the employment decision, even though there may be multiple proximate causes." Pl.'s Resp. 29 (quoting Staub v. Proctor Hosp., 562 U.S. 411, 419-20 (2011)). According to Plaintiff, there is sufficient evidence to infer that the discriminatory actions of managers Mr. Baranowski, Mr. Johnson, and Mr. Pierce influenced Ms. Withrow regarding the discipline and termination of Plaintiff. In other words, if Plaintiff's discipline was initiated by biased supervisors and Ms. Withrow relied on the supervisor's reports of Plaintiff's conduct, then Ms. Withrow's recommendation to terminate was influenced by biased subordinates.

In Staub, the plaintiff alleged that his supervisors had hostility to his obligations as a military reservist and that their "write-up" influenced the decision of a human resources employee to fire him. Id. The Supreme Court in Staub held, in a USERRA case, that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." Id. at 422 (emphasis in original). The Court explained that "[a]n employer's authority to reward, punish, or dismiss is often allocated among multiple agents. The one who makes the ultimate decision does so on the basis of performance assessments by other supervisors." Id. at 420.

The Ninth Circuit recently addressed this issue in France v. Johnson, No. 13-15534, 2015 WL 4604730, at *5 (9th Cir. Aug. 3, 2015). The Court explained that "even if a subordinate employee with bias was not the final decisionmaker, the plaintiff can establish a causal link by proving that 'the biased subordinate influenced or was involved in the decision or decisionmaking process.'" 494 F.3d at 1182. In France, the plaintiff produced evidence showing the biased subordinate's influence and substantial involvement in hiring decisions, even though he was not the final decision-maker on hiring.

19 - OPINION & ORDER

Staub, France, and other cases cited by Plaintiff clearly allege bias on the part of the subordinate employee. For example, in Staub, the biased subordinates made derogatory comments about the plaintiff's military service, such as stating that the plaintiff's service had been a "strain on the department" and consisted of "a bunch of smoking and joking and a waste of taxpayers' money." Staub, 562 U.S. at 414. In France, an age discrimination case, the biased subordinate had repeated discussions with the plaintiff about how he should retire and made statements about his preference for "young dynamic agents." Id. at *4. In Shager v. Upjohn Co., 913 F.2d 398, 406 (7th Cir. 1990), also an age discrimination case, the plaintiff alleged that the biased subordinate felt uncomfortable with the older workers under his supervision, set up one of them for failure, then brought in a younger worker whom he didn't need, and then fired the older worker on trumped-up charges while covering the failures of the inadequate younger worker who was his protégé. In McKenna v. City of Philadelphia, 649 F.3d 171 (3d Cir. 2011), Caucasian former police officers brought suit against the city under Title VII, alleging that their supervisors violated their right to be free from retaliation for opposing racial discrimination in the workplace. The supervisor had told the plaintiff that if he made an EEOC complaint, that he would make the plaintiff's life "a living nightmare." Id. at 173. The supervisor also ordered the plaintiff not to share his concerns with a higher level supervisor. Id. at 174. The Third Circuit affirmed that whether the supervisor's retaliatory animus against the plaintiff was the cause of his termination was properly considered by the jury. Id. at 180.

Here, the evidence Plaintiff presents of bias on the part of subordinate employees Mr. Baranowski, Mr. Johnson, or Mr. Pierce pales in comparison to the above cases. Plaintiff testified that when Plaintiff discussed the rising cost of health insurance with Mr. Johnson, Mr. Johnson made remarks such as: "it's good that you have medical benefits," "lucky a guy like you

has insurance," and "isn't it nice that we have health insurance with how much things cost and what [you are] going through." Rohny Decl. Ex. Z at 147:20-149:2, ECF 47. As evidence of bias, Plaintiff declares that Mr. Baranowski, Mr. Johnson, and Mr. Pierce sometimes conducted morning driver meetings and that "management and/or human resources would frequently lead discussions" about Defendant's health insurance plan and rising costs of health insurance. Pl. Decl., ECF 48, at ¶¶ 6, 7. These statements are a far cry from the biased statements cited in other cases. Plaintiff presents no evidence to suggest that Mr. Baranowski, Mr. Johnson, or Mr. Pierce knew the cost of his medication to the company[7] or harbored any feelings of bias towards disabled employees, employees with cancer, or employees with high medical costs.

      C.      Plaintiff fails to establish his prima facie case

In sum, Plaintiff's case fails because he is unable to establish that the people who made the decision to terminate him knew or were motivated by the fact that he was disabled or regarded as disabled.

**II.      Common Law Wrongful Discharge**

Plaintiff also brings a claim of wrongful discharge, alleging that he "was terminated for exercising an important societal interest and exercising his right to equal terms, conditions, and benefits of employment, including his right to health care benefits."

Under Oregon law an employer may discharge an employee at any time for any reason unless doing so violates a contractual, statutory, or constitutional requirement. Yeager v. Providence Health Sys. Or., 195 Or. App. 134, 140, 96 P.3d 862 (2004). The tort of wrongful discharge is a narrow exception to this general rule. See Dew v. City of Scappoose, 208 Or. App. 121, 140, 145 P.3d 198 (2006). The tort of wrongful discharge was not intended to be a tort of

---

[7] In addition, Mr. Baranowski submits a declaration that he never received information about the cost of Plaintiff's health care. Baranowski Decl. ¶ 17, ECF 39.

general application but rather an interstitial tort to provide a remedy when the conduct in question is unacceptable and no other remedy is available. Reddy v. Cascade Gen., Inc., 227 Or. App. 559, 567, 206 P.3d 1070 (2009) (citation omitted). See also Draper v. Astoria Sch. Dist. No. 1C, 995 F. Supp. 1122, 1128 (D. Or. 1998).

"The elements of a wrongful discharge claim are simple: there must be a discharge, and that discharge must be 'wrongful.'" Garmon v. Plaid Pantries, No. 3:12-CV-1554-AC, 2013 WL 3791433, at *25 (D. Or. July 19, 2013) (citing Moustachetti v. Oregon, 319 Or. 319, 325 (1994). Oregon courts have recognized two circumstances that give rise to the common-law tort of wrongful discharge: (1) discharge for exercising a job-related right of important public interest and (2) discharge for complying with a public duty. Plaintiff argues that his case falls under this first category. Examples of the first category include discharge for filing a worker's compensation claim, Brown v. Transcon Lines, 284 Or. 597, 588 P.2d 1087 (1978), and resisting sexual harassment by a supervisor, Holien v. Sears, Roebuck & Co., 298 Or. 76, 689 P.2d 1292 (1984). Under Oregon law, however, "a wrongful discharge claim is not available to a plaintiff who alleges that [he] was discharged in violation of a right in contrast to being discharged for pursuing that right." Larmanger v. Kaiser Found. Health Plan of the Nw., 895 F. Supp. 2d 1033, 1046 (D. Or. 2012) aff'd, 585 F. App'x 578 (9th Cir. 2014).

As to proving that the discharge was wrongful, the plaintiff must establish a causal connection between the discharge and the exercise of his employment related right. Garmon, 2013 WL 3791433, at *25 (citing Estes v. Lewis and Clark College, 152 Or. App. 372, 381 (1998) (citing Shockey v. City of Portland, 313 Or. 414, 422–23 (1992)). Establishing "a causal connection requires a showing that the employee's protected activity was a substantial factor in the motivation to discharge the employee." Sheppard v. David Evans and Assoc., 694 F.3d 1045,

22 - OPINION & ORDER

1050 (9th Cir. 2012) (citation and quotation marks omitted). To qualify as a substantial factor,

"the employer's wrongful purpose must have been a factor that made a difference in the

discharge decision." Id. (citation and quotation marks omitted).

Plaintiff argues that his exercise of his right to use the employer-sponsored healthcare

benefits program constitutes the exercise of a job-related right of important public interest.

According to Plaintiff, in staff meetings he "exercised an employment-related right by invoking

[his] right to health care benefits . . . oppos[ing] Con-way's reducing benefits for its employees

while passing on more costs to employees, opposing the rise in premiums while coverage got

worse, and . . . rais[ing] concerns about being able to afford leukemia medications and

treatment[.]" Davis Decl. ¶ 8, ECF 48. Plaintiff does not allege a causal connection between his

protected activity and the termination decision, except to say that temporal proximity between

protected activity and an adverse employment action can constitute sufficient circumstantial

evidence of retaliation.

Defendant argues that Plaintiff's claim is preempted by ERISA[8]. The Ninth Circuit has

explained that "ERISA's preemption clause, § 514(a), as set forth in 29 U.S.C. § 1144(a), is to be

read expansively." Tingey v. Pixley-Richards W., Inc., 953 F.2d 1124, 1130 (9th Cir. 1992).

"ERISA preempts state law causes of action that offer remedies for the violation of rights

expressly guaranteed by ERISA and exclusively enforced by ERISA's civil enforcement

mechanism, § 502(a), 29 U.S.C. § 1132(a)." Id. (citing Ingersoll-Rand v. McClendon, 498 U.S.

133 (1990). Therefore, the Ninth Circuit has found that ERISA preempted a plaintiff's state law

claims of wrongful termination and disability discrimination based on the allegation that the

---

[8] Defendant's Motion for Summary Judgment, ECF 37, argued that because Plaintiff has an adequate statutory remedy for his claim of disability discrimination, he has no viable wrongful discharge tort claim as a matter of law. However, Plaintiff responded that invocation of his right to health care, not disability discrimination, is the basis for his wrongful discharge claim. Therefore, Defendant introduced its preemption argument in its Reply.

employer did not want to continue to pay the plaintiff's expensive benefits. <u>Felton v. Unisource Corp.</u>, 940 F.2d 503, 510 (9th Cir. 1991) ("[W]hen the plaintiff contends that the motivating factor behind her termination was the defendant's attempt to evade benefit payments, preemption is clear."); <u>see also</u> <u>Tingey</u>, 953 F.2d at 1131 (plaintiff's claim that he was fired because his employer did not want to pay his benefits was preempted by ERISA); <u>Javansalehi v. BF & Associates, Inc.</u>, No. 3:10-CV-850-PK, 2012 WL 1566184, at *6 (D. Or. May 2, 2012).

Plaintiff's wrongful discharge claim is somewhat more nuanced than <u>Felton</u> or <u>Tingey</u>. While Plaintiff alleges that he was fired because Defendant did not want to pay his benefits, he also alleges that he was fired because he invoked his right to health care benefits. SAC ¶ 42. Plaintiff cites the Public Health Service Act, ERISA and the Internal Revenue Code for the proposition that group health plans and health insurance issuers may not discriminate against participants, beneficiaries, and individuals in eligibility, benefits, or premiums based on a health factor. 42 USC 300gg-4, 29 USC § 1182, 26 USC § 9802. However, there is no allegation here that Plaintiff faced discrimination related to the terms of his health insurance coverage and Plaintiff presents no evidence to support his theory that he was fired merely for invoking his rights to benefits.

It seems clear to the Court that the basis of Plaintiff's case is his allegation that Defendant did not want to employ a person with such expensive healthcare. A claim brought on that basis is clearly preempted by ERISA. Furthermore, because Plaintiff fails to show that the people who decided to terminate Plaintiff knew about his medical condition or the cost of his health care, Plaintiff's wrongful discharge claim fails because he cannot show a causal connection between the invocation of his right to health care benefits and his termination.

**III.    Attorney's Fees**

Defendant requests that the Court award Defendant attorney's fees and costs because Plaintiff's claims are frivolous, unfounded, or objectively unreasonable. See Hamlin v. Hampton Lumber Mills, Inc., 227 Or. App. 165, 168, 205 P.3d 70, 72 (2009) (explaining that, under ORS 65A.885(1), prevailing defendants generally cannot recover attorney fees unless they can show that the plaintiff brought a claim in bad faith or asserted a frivolous, unfounded, or objectively unreasonable claim).

The Court denies this request. Even though the Court grants Defendant's motion for summary judgment, the Court does not go so far as to say that Plaintiff's position lacks any arguable support or is baseless.

## CONCLUSION

The Court grants Defendant's motion for summary judgment [37] because Plaintiff fails to establish a prima facie case of disability discrimination and because Plaintiff's wrongful discharge claim is preempted by ERISA. Accordingly, this case is DISMISSED. Pending motions, if any, are dismissed as moot.

IT IS SO ORDERED.

Dated this ____ day of _____, 2015.


MARCO A. HERNÁNDEZ
United States District Judge

25 - OPINION & ORDER